UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| OLIVIA CASILLAS, ) | |
| ) | |
| Plaintiff, ) | Case No. CV 08-07441 AJW |
| ) | |
| v. ) | MEMORANDUM OF DECISION |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| **Commissioner of the Social** ) | |
| **Security Administration,** ) | |
| ) | |
| Defendant. ) | |
| _____) | |

Plaintiff filed this action seeking reversal of the decision of the defendant, the Commissioner of the Social Security Administration (the "Commissioner"), denying plaintiff's application for disability insurance benefits. The parties have filed a Joint Stipulation ("JS") setting forth their contentions with respect to each disputed issue.

**Background**

The lengthy procedural history of this case is detailed in the Joint Stipulation. [See JS 2-5]. Plaintiff filed her benefits application on September 8, 1998, alleging disability commencing on December 31, 1997. [JS 2]. Plaintiff returned to work on March 1, 2004, and therefore seeks disability benefits for the closed period between December 31, 1997 and that date. After numerous administrative hearings and three remands at the administrative level, an Administrative Law Judge (the "ALJ") issued a written hearing decision on November 29, 2006 that constitutes the final decision of the Commissioner in this case.

1  [Administrative Record ("AR") 17-30]. The ALJ found that during the closed period, plaintiff had severe
2  impairments consisting of status post bilateral carpal tunnel release, degenerative disc disease and
3  degenerative arthritis of the neck and low back, surgically treated right ring trigger finger, obesity, abnormal
4  liver enzymes due to steroid hepatitis, left modified radical mastectomy in 1997, recurrence of breast cancer
5  in 2001, a depressive reaction to physical condition, and a psycho-physiological reaction to pain. [JS 3; AR
6  21]. The ALJ determined that during the closed period, plaintiff retained the residual functional capacity
7  ("RFC") for a restricted range of sedentary work. Based on the testimony of a vocational expert, however,
8  the ALJ further found that plaintiff's RFC did not preclude her from performing work available in
9  significant numbers in the national economy, specifically, the jobs of "space scheduler" and "information
10 clerk.". [See JS 2-4; AR 22-30]. Therefore, the ALJ concluded that plaintiff was not disabled at any time
11 during the closed period. [JS 4; AR 30].

## Standard of Review

13 The Commissioner's denial of benefits should be disturbed only if it is not supported by substantial
14 evidence or is based on legal error. Stout v. Comm'r, Social Sec. Admin., 454 F.3d 1050, 1054 (9th Cir.
15 2006); Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002). "Substantial evidence" means "more than
16 a mere scintilla, but less than a preponderance." Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir.
17 2005). "It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."
18 Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005)(internal quotation marks omitted). The court is
19 required to review the record as a whole and to consider evidence detracting from the decision as well as
20 evidence supporting the decision. Robbins v. Social Sec. Admin, 466 F.3d 880, 882 (9th Cir. 2006);
21 Verduzco v. Apfel, 188 F.3d 1087, 1089 (9th Cir. 1999). "Where the evidence is susceptible to more than
22 one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."
23 Thomas, 278 F.3d at 954 (citing Morgan v. Comm'r of Social Sec. Admin., 169 F.3d 595, 599 (9th
24 Cir.1999)).

## Discussion

**Transferability of skills**

27 Plaintiff contends that the record lacks substantial evidence supporting the ALJ's finding that
28 plaintiff had transferable skills that could meet the requirements of the alternative jobs of space scheduler

and information clerk identified by the vocational expert, and that the ALJ erred in failing to explain the conflict between the vocational expert's testimony and the Dictionary of Occupational Titles ("DOT"). [See JS 5-16; AR 29-30].

Whether or not a claimant has transferable work skills is relevant in assessing the claimant's capacity to perform alternative work at step five of the sequential evaluation procedure. See generally 20 C.F.R. §§ 404.1568, 416.968; SSR 82-41, 1982 WL 31389, at *1. "Skills refer to experience and demonstrated proficiency with work activities in particular tasks or jobs. In evaluating the skill level of past relevant work or potential occupations, work activities are the determining factors." SSR 82-41, 1982 WL 31389, at *3. "The claimant is in the best position to describe just what he or she did in past relevant work, how it was done, what exertion was involved, [and] what skilled or semiskilled work activities were involved," but the ALJ also may consult the DOT or a vocational expert for assistance in determining skill levels. SSR 82-41, 1982 WL 31389, at *4.

A claimant's acquired skills are transferable to other jobs when the skilled or semiskilled work activities the claimant performed in past relevant work "can be used to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work. This depends largely on the similarity of occupationally significant work activities among different jobs." 20 C.F.R. §§ 404.1568(d)(1), 416.968(d)(1); see SSR 82-41, 1982 WL 31389, at *2. Transferability "is most probable and meaningful among jobs in which: (1) the same or a lesser degree of skill is required, because people are not expected to do more complex jobs than they have actually performed (i.e., from a skilled to a semiskilled or another skilled job, or from one semiskilled to another semiskilled job); (2) the same or similar tools and machines are used; and (3) the same or similar raw materials, products, processes or services are involved. A complete similarity of all these factors is not necessary." SSR 82-41, 1982 WL 31389, at *5; see 20 C.F.R. §§ 404.1568(d)(2)-(3), 416.968(d)(2)-(3). Some acquired job skills are "unique to a specific work process in a particular industry or job setting," while others "have universal applicability across industry lines . . . ." SSR 82-41, 1982 WL 31389, at *6. A claimant who does not have skills that are transferable to other work is considered unskilled for purposes of the step five determination. See Silveira v. Apfel, 204 F.3d 1257, 1261 (9th Cir. 2000); see also SSR 82-41, 1982 WL 31389, at *1-*2.

When transferability of skills is an issue and must be decided, the ALJ

> is required to make certain findings of fact and include them in the written decision. Findings should be supported with appropriate documentation. [¶] When a finding is made that a claimant has transferable skills, the acquired work skills must be identified, and specific occupations to which the acquired work skills are transferable must be cited in the ALJ's decision.

Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d. 1219(9th Cir. 2009)(ellipses omitted)(quoting SSR 82-41, 1982 WL 31389, at *7).

Prior to undergoing breast cancer surgery in December 1997, plaintiff had worked as a "travel counselor, automobile club," DOT job number 238.167-014. Plaintiff spent a total of about twenty-four years working for the automobile club. After working there for about seven years, she went to work for a bank for a year. She returned to the automobile club in 1980 and worked there through the end of 1997. [AR 22, 28-29, 199-204, 245, 799].

During the hearing, the ALJ posed hypothetical questions ascribing various exertional and nonexertional limitations to a person of plaintiff's age and education. [See AR 732-736, 746-752]. The ALJ ultimately found that during the closed period, plaintiff had the RFC

> to perform a limited range of sedentary exertion. The claimant could stand and walk for 2 hours out of an 8-hour work day and sit for 6 hours out of an 8-hour work day with normal breaks. She could lift and carry[ ] 10 pounds frequently and occasionally. She could not climb, balance, work at heights, or around unprotected machinery. She could not do forceful gripping, grasping, or twisting with her hands, but she could do occasional fine manipulation. She could perform constant handling for 4 hours out of an 8-hour work day. She could perform occasional neck motions, but avoid extremes of motion. She could maintain occasional fixed head positions for 15 to 30 minutes. She could occasionally stoop and bend. The claimant's mental impairments limited her to moderately complex tasks consisting of 3-5 step instructions in a habituated setting. She could not work around hazardous machinery or perform fast-paced work, such as [on] rapid assembly lines.

[AR 22].

After posing a hypothetical question, the ALJ asked the vocational expert, "Would there be any skills

that would transfer to jobs within those limitations?" The vocational expert did not respond to that question immediately, but instead asked the ALJ to clarify aspects of the hypothetical question. [AR 749-750]. The ALJ did so, and then added: "And the question that I'd ask, that you're still pondering, is whether there are skills that transfer to jobs within those limitations[?]" [AR 749-750]. The vocational expert replied, "Yes, I believe I can identify a couple. I'll need a couple of moments to check my resources, Your Honor." [AR 750]. After some additional colloquy between the ALJ and vocational expert about the hypothetical person's limitations, the vocational expert testified, "Considering that hypothetical, a space schedule[r], that's the . . . job title, could be performed. In the region, there's approximately 1, 300 such jobs; and nationally, about 15,000. Another example ---" [AR 750]. The ALJ interrupted with a question: "Okay, just a minute. What are the transferable skills?" [AR 751]. The vocational expert answered, "[T]he transferable skills are clerical skills, data input, and basic office skills, and some customer service. Another [job] would be that of information clerk, which is sedentary, semiskilled, S.P. four. In the region, 3, 200 jobs; nationally, 36, 000." [AR 751]. The ALJ then asked, "Same skills that transfer?" The vocational expert responded "Yes." [AR 751].

In his written decision, the ALJ said:

> The vocational expert was asked if any occupations exist which could be performed by an individual with the same age, education, past relevant work experience, and residual functional capacity as the claimant, and which require skills acquired in the claimant's past relevant work but no additional skills.

[AR 29 (italics added)].

Plaintiff argues that the ALJ's hypothetical question was flawed because he did not ask the vocational expert to assume that the hypothetical person possessed "no additional skills," and because an examination of the record indicates that the ALJ did not adequately consider whether additional skills were required to perform the alternative jobs identified by the vocational expert.

Transferability exists when acquired skills "can be used to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work." 20 C.F.R. §§ 404.1568(d)(1), 416.968(d)(1). The discrepancy between the ALJ's hypothetical question to the vocational expert, which did not specify "no additional skills," and the ALJ's written finding, which includes that restriction, creates ambiguity as

to whether the ALJ sufficiently narrowed the assumptions he asked the vocational expert to make. If excluding the acquisition of "additional skills" was necessary to the ALJ's finding, he should have so instructed the vocational expert. See Kamerling v. Massanari, 295 F.3d 206, 210 (2d Cir. 2002)(noting that the ALJ cannot take administrative notice of transferability of skills, but instead must obtain vocational expert evidence to identify transferable skills and occupations to which skills may be transferred).

The ambiguity created by the ALJ's hypothetical question is intensified when carefully considering the issue of transferability in light of plaintiff's RFC for less than the full range of sedentary work. An RFC for less than a full range of sedentary work is not per se disabling, but that RFC "reflects very serious limitations" and "is expected to be relatively rare." SSR 96-9p, 1996 WL 374185, at *1. When an individual is limited to an incomplete range of sedentary work, the ALJ "is required to make an individualized determination, considering age, education, and work experience, including any skills the individual may have that are transferable to other work . . . ." SSR 96-9p, 1996 WL 374185, at *3.

The DOT classifies the jobs of space scheduler and information clerk as sedentary jobs that do not require climbing, balancing, stooping, kneeling, crouching, or crawling. Unlike many sedentary jobs, they also demand only occasional reaching, handling, or fingering, restrictions that were considered at some length by the ALJ and the vocational expert. Those limitations are consistent with plaintiff's RFC as found by the ALJ. However, the ALJ also found that plaintiff had postural limitations of the neck and head. Specifically, plaintiff could perform occasional neck motions, but she needed to avoid extremes of motion. She could maintain occasional fixed head positions for only 15 to 30 minutes. Use of the head is important at all exertional levels. SSR 83-14, 1983 WL 31254, at *2. Based on the job information in the DOT as well as the vocational expert's testimony, some of the primary tasks involved in performing the jobs of space scheduler and information clerk are compiling data, maintaining and consulting records, charts, and schedules, and heavy use of the phone and computer. [See AR 752-758]. Limitations in using the head and neck could interfere with the required performance of those tasks. See SSR 82-41, 1982 WL 31389, at *4 (stating that postural limitations "may prevent a claimant from performing semiskilled or skilled work activities essential to a job").

In addition, the ALJ found that plaintiff had mental limitations restricting her to moderately complex tasks consisting of 3-5 step instructions in a habituated setting. [AR 22]. That nonexertional limitation is

1  separate and distinct from plaintiff's transferable skills. *All* functional limitations included in the RFC, both
2  exertional and nonexertional,

> *must be considered* in determining transferability. For example, exertional limitations may prevent a claimant from operating the machinery or using the tools associated with the primary work activities of his or her past relevant work. Similarly, environmental, manipulative, *postural, or mental limitations may prevent a claimant from performing semiskilled or skilled work activities essential to a job*. . . . These factors as well as the general capacity to perform a broad category of work (e.g., sedentary, light or medium) *must be considered* in assessing whether or not a claimant has transferable work skills.

SSR 82-41, 1982 WL 31389, at *6 (italics added).

The DOT job descriptions for space scheduler and information clerk do not take into account the head and neck limitations or the mental limitations established by the ALJ's RFC finding. The ALJ did not specifically ask the vocational expert to consider how those nonexertional limitations would affect plaintiff's transferable skills or her ability to perform those jobs. When plaintiff's attorney attempted to clarify the effect of the vocational effect of those limitations, moreover, the ALJ interrupted her and did not allow the vocational expert to answer. [See AR 734-735]. Furthermore, the ALJ never queried the vocational expert as to whether there was any conflict between his testimony and the DOT and, if so, the basis for resolving the conflict. [See AR 732-736, 748-752]. Those omissions were legal error. See SSR 00-4p, 2000 WL 1898704, at *4 ("When a [vocational expert] provides evidence about the requirements of a job or occupation, . . . the adjudicator will . . . [a]sk the [vocational expert] if the evidence he or she has provided conflicts with information provided in the DOT," and if the vocational expert's "evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict"); Massachi v. Astrue, 486 F.3d 1149, 1153-1154 (9th Cir. 2007)(stating that "the ALJ must first determine whether a conflict exists" between the DOT and a vocational expert's testimony; if so, "the ALJ must then determine whether the vocational expert's explanation for the conflict is reasonable and whether a basis exists for relying on the expert rather than the" DOT, and holding that the ALJ committed reversible error by failing to "ask the vocational expert whether her testimony conflicted with the [DOT] and, if so, "whether there was a reasonable explanation for the conflict")(footnotes omitted)(citing SSR 00-4p, at *2-*4). The ALJ's

1 errors were not harmless because here, as in Massachi, "we have an apparent conflict with no basis for the
2 vocational expert's deviation," leaving "unresolved potential inconsistencies in the evidence." Massachi,
3 486 F.3d at 1154 & nn.19-20 (alteration omitted)(quoting Prochaska v. Barnhart, 454 F.3d 731, 736 (7th
4 Cir.2006)).

**Treating physician's opinion**

Plaintiff contends that the ALJ erred in rejecting the opinions of treating physician Ireny Ibrahim, M.D. [JS 16-25].

The ALJ must provide clear and convincing reasons, supported by substantial evidence in the record, for rejecting an uncontroverted treating source opinion. If contradicted by that of another doctor, a treating or examining source opinion may be rejected for specific and legitimate reasons that are based on substantial evidence in the record. Batson v. Comm'r of Social Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004); Tonapetyan v. Halter, 242 F.3d 1144, 1148-1149 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830-831 (9th Cir. 1995).

Plaintiff began seeing Dr. Ibrahim in September 2001. He treated her for headaches; neck, shoulder and elbow problems; allergies; hypertension; a history of breast cancer with left mastectomy; lymphedema[1]; abnormal liver function tests; and low back pain. During her initial visit, Dr. Ibrahim noted that plaintiff had a nodule on the left side of the chest wall and he referred her to an oncologist in the same medical practice, Dr. Hilliard. The nodule was excised and a biopsy was performed, revealing a recurrence of plaintiff's breast cancer. At Dr. Hilliard's direction, plaintiff underwent radiation and continued tamoxifen. Treatment records indicate that plaintiff continued to see Dr. Hilliard until March 2003. Dr. Hilliard copied Dr. Ibrahim on all of his examination reports. [See AR 649-697].

Dr. Ibrahim completed a RFC assessment form on May 1, 2003. [AR 145-148]. He said that plaintiff's first visit was in September 2001, and her last visit was on May 1, 2003. He noted that plaintiff was seeing Dr. Hilliard 2 to 3 times a month. Dr. Ibrahim stated that plaintiff's diagnosis was breast lymphedema and degenerative spinal disease. [AR 145]. He opined that plaintiff was unable to work. [AR

---

[1] Lymphedema is "[s]welling (especially in subcutaneous tissues) as a result of obstruction of lymphatic vessels or lymph nodes and the accumulation of large amounts of lymph in the affected region." Stedman's Medical Dictionary lymphedema (27th ed. 2000).

8

1  146-148].

2     The ALJ concluded that Dr. Ibrahim's disability opinion was not entitled to significant weight. [AR 27]. Almost all of the ALJ's reasons for rejecting Dr. Ibrahim's opinion are legally untenable or lack substantial support in the record. First, the ALJ said that the quality of the copy of Dr. Ibrahim's report was "poor and parts are impossible to read," including his sitting and standing limitations. [AR 27]. The ALJ should have obtained a better copy or contacted Dr. Ibrahim for clarification rather than using poor copy quality as a reason to disregard his opinion. Cf. Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996)(holding that where a treating physician did not explain the basis for his opinion, the ALJ erred in speculating that his opinion was based on unwarranted assumptions without "conduct[ing] an appropriate inquiry," such as by subpoenaing the physician, submitting further questions to him, or continuing his hearing to augment the record) (citing 42 U.S.C. § 405(d) and 20 C.F.R. §§ 404.950(d), 404.944, & 404.1527(c)(3)).

     Second, the ALJ concluded that Dr. Ibrahim had seen plaintiff on only two occasions, one and a half years apart, and that plaintiff was "seeing another doctor on a regular basis." [AR 27]. Actually, Dr. Ibrahim examined plaintiff personally more than twice during that one-and-a-half-year period, referred her for consultations, ordered diagnostic tests, and prescribed treatment. [AR 145, 669-672, 677-678, 689-691]. That is sufficient for him to be considered a bona fide treating physician. See Ghokassian v. Shalala, 41 F.3d 1300, 1303 (9th Cir. 1994) (holding that the conclusions of a physician who treated the claimant twice in fourteen months were entitled to deference); see also Benton ex rel. Benton v. Barnhart, 331 F.3d 1030, 1038 (9th Cir. 2003)(explaining that the treatment relationship is better viewed not from an all-or-nothing perspective, but "as a series of points on a continuum reflecting the duration of the treatment relationship and the frequency, and nature of the contact")(quoting Ratto v. Sec'y, Dep't of Health & Human Servs., 829 F.Supp. 1415, 1425 (D. Or. 1992)). The ALJ also failed to acknowledge that the "other doctor" plaintiff was seeing, Dr. Hilliard, was a member of Dr. Ibrahim's medical group who was treating plaintiff pursuant to a referral from Dr. Ibrahim and who routinely apprised Dr. Ibrahim of plaintiff's treatment and progress. Cf. Benton, 331 F. at 1036-1040 (reversing and remanding where the ALJ failed adequately to consider the opinion of a supervising physician who was (1) a member of a treatment team; (2) "transmitting both his own knowledge and opinion of [the claimant] and those of the medical treatment teams under his

1 supervision"; and (3) "had the opportunity to direct and communicate with the treatment team over time,
2 and is presumably well placed to know their skills, abilities, and therapeutic techniques").

3         Third, the ALJ rejected Dr. Ibrahim's opinion because plaintiff "returned to work within a year of
4 Dr. Ibrahim's examination, and there was no major change or improvement in her condition." [AR 27]. Dr.
5 Ibrahim first saw plaintiff in September 2001, and she resumed part-time work in March 2004, eventually
6 graduating to full-time employment. Dr. Ibrahim's May 2003 assessment pertains to the period beginning
7 in September 2001, so any suggestion that his report fails to show disability for a period of at least twelve
8 continuous months is unfounded. Plaintiff does not contend that she was disabled for twelve continuous
9 months *after* the date of Dr. Ibrahim's report.  The record also indicates that between September 2001 and
10 March 2004, plaintiff's condition did change and eventually improve. For example, she was diagnosed and
11 successfully treated for a recurrence of breast cancer, she underwent a treatment program for lymphedema,
12 and she received treatment for depression. [See AR 244, 649-697, 768-772].

13        For these reasons, the ALJ's evaluation of Dr. Ibrahim's opinion is not supported by substantial
14 evidence in the record and reflects application of the incorrect legal standards.

15        **Remedy**

16        In general, the choice whether to reverse and remand for further administrative proceedings, or to
17 reverse and simply award benefits, is within the discretion of the court. See Harman v. Apfel, 211 F.3d
18 1172, 1178 (9th Cir.) (holding that the district court's decision whether to remand for further proceedings
19 or for payment of benefits is discretionary and is subject to review for abuse of discretion), cert. denied, 531
20 U.S. 1038 (2000).  The Ninth Circuit has observed that "the proper course, except in rare circumstances,
21 is to remand to the agency for additional investigation or explanation." Moisa v. Barnhart, 367 F.3d 882,
22 886 (9th Cir. 2004) (quoting INS v. Ventura, 537 U.S. 12, 16 (2002) (per curiam)).   A district court,
23 however,

24      should credit evidence that was rejected during the administrative process and remand for
25      an immediate award of benefits if (1) the ALJ failed to provide legally sufficient reasons for
26      rejecting the evidence; (2) there are no outstanding issues that must be resolved before a
27      determination of disability can be made; and (3) it is clear from the record that the ALJ
28      would be required to find the claimant disabled were such evidence credited.

10

1  Benecke v. Barnhart, 379 F.3d 587, 593 (9th Cir. 2004) (citing Harman, 211 F.3d at 1178). The Harman test
2  "does not obscure the more general rule that the decision whether to remand for further proceedings turns
3  upon the likely utility of such proceedings." Harman, 211 F.3d at 1179; see Benecke, 379 F.3d at 593
4  (noting that a remand for further administrative proceedings is appropriate "if enhancement of the record
5  would be useful").

6  In the circumstances of this case, a remand for an award of a close period of disability benefits is
7  the appropriate remedy. The ALJ failed to provide legally sufficient reasons for rejecting a treating source
8  disability opinion and erroneously relied on the vocational expert's testimony. Consequently, the
9  Commissioner did not satisfy his burden at step five of the sequential evaluation procedure to identify
10 alternative work that plaintiff can perform. Due to numerous missteps at the administrative level, six
11 administrative hearings already have been conducted in this case, which was pending before the
12 Commissioner for roughly ten years before this action was filed. Remanding this case to the Commissioner
13 for enhancement of the record as it pertains to the closed period would serve no useful purpose.[2] It also
14 would be unfair to plaintiff.

**Conclusion**

For the reasons stated above, the Commissioner's decision is not supported by substantial evidence and does not reflect application of the proper legal standards. Accordingly, the Commissioner's decision is **reversed**, and this case is **remanded** to the Commissioner for an award of benefits consistent with this memorandum of decision.

**IT IS SO ORDERED.**

March 10, 2010

ANDREW J. WISTRICH
United States Magistrate Judge

---

[2] This disposition makes it unnecessary to consider plaintiff's remaining contentions.

11